O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH REBER and DAVID DUNNINGTON, | CASE NO. SA CV07-0607 DOC (RZx) |
| Plaintiff(s), | O R D E R GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| AIMCO/BETHESDA HOLDINGS, INC., | |
| Defendant(s). | |

Before the Court are Defendant's Motions for Summary as to Claims Brought by Plaintiffs Keith Reber and David Dunnington. After considering the moving, opposing and replying papers, as well as the parties' oral argument, and for the following reasons, the Court hereby GRANT IN PART AND DENIES IN PART Defendant's Motions.

I.      BACKGROUND

Defendant AIMCO/Bethesda Holdings, Inc. ("AIMCO") purchases, maintains and manages apartment communities. Plaintiff Keith Reber ("Reber") served as a Director of Construction ("DOC") for AIMCO from April 2005 to May 2006. From May 2006 to February 2007, Reber served as a Senior Director of Construction ("SDOC"). Plaintiff David Dunnington ("Dunnington") served as a DOC from January, 2006 to January, 2007. AIMCO classified Reber and Dunnington as administrative employees, exempt from California overtime and meal

1    and rest break requirements.  *See* Industrial Welfare Comm'n, Wage Order 5-2001.

2    Consequently, AIMCO paid  Reber and Dunnington between $70,000 and $80,000 per year, but

3    did not pay them overtime or give them meal and rest breaks.  Reber and Dunnington sued

4    claiming that they were misclassified as administrative employees, and were entitled to overtime

5    and meal and rest breaks.

6         AIMCO distinguishes between operations and capital repair and capital improvement

7    ("CRCI") divisions.  Operations handles leasing, collecting rent, resident complaints,

8    maintenance, etc..  Because operations did not have the expertise to handle large-scale

9    construction projects, CRCI, part of the Construction Services department, was responsible for

10   such projects at apartment communities.  Both Reber and Dunnington, having significant

11   construction experience, worked as DOCs in the CRCI division.

12        Both Reber and Dunnington began their work as DOCs in the affordable properties group.

13   After a few months, both were transferred to the conventional properties group.  DOCs act as

14   construction project managers on capital improvement projects in AIMCO communities.

15        A significant portion of their job is to develop Property Capital Assessments ("PCAs")

16   for each of their 15-25 properties.  To do so, they would assess, in detail, the condition of the

17   property and determine which items needed repair or replacement over the next five years.  The

18   PCA included a prioritized list of which projects the DOC thought should be completed over that

19   period, and the DOCs estimate of the costs of those projects.  The PCAs also included

20   improvments the DOCs thought advisable.

21        AIMCO uses the PCAs to set its capital improvement budget for each property.

22        After AIMCO set the budget for each property, the DOCs "execute" the recommended

23   projects.  This means that they develop a "work scope" or "plan of attack" for each project, get

24   approval from AIMCO, and solicit bids from contractors.  Dunnington and Reber selected

25   contractors either based on their own experience or from a "blue book" commonly used in the

26   industry.  After three bids came in, the DOCs recommended one contractor to AIMCO.  AIMCO

27   then reviewed the bids and selected a contractor.  The DOCs worked with AIMCO's contracts

28

1  department to develop a contract for the winning bidder, which the DOCs reviewed and signed.

2  After signing the contract, the DOCs developed a schedule for the project in conjunction with

3  the manager of the property.

4        The DOCs also oversaw the projects and worked with the contractors to assure that the

5  projects came in on time, within AIMCO's budget, and with a minimal impact on the apartment

6  community.  This included assessing the contractors' work, solving immediate problems with

7  the apartment communities, determining whether project "milestones" were being met,

8  disbursing payments, negotiating invoices and paying vendors, handling change orders, etc..  At

9  the end of a project, the DOC would determine whether the work was complete and acceptable.

10  If so, he would distribute payment.  If not, he would develop a list of things that needed to be

11  completed.  The DOCs also reported back to AIMCO about their progress.

12        In addition to developing and executing PCAs, Dunnington was assigned to oversee a

13  large project at the Hillcreste community from April or May 2006 through September 2006.

14  AIMCO recieved many complaints regarding a renovation of the grounds and apartments at the

15  Hillcreste community.  Thus, a manager asked Dunnington to go to the property and act as a

16  "superintendent," figuring out how to minimize complaints.  He largely succeeded by making

17  himself available as AIMCO's representative, setting schedules and rules for contractors, and

18  overseeing the project.  Dunnington also stayed in contact with AIMCO to report on the progress

19  on this project.  He made recommendations to his managers about various aspects of this project.

20  Finally, he prepared draft correspondence, which, after his manager's approval, was sent to the

21  general contractor.

22        In May 2006, Reber was promoted to SDOC.  In this capacity, he managed a $12 million

23  apartment redevelopment project and a $1 million new building at one site.  Although the work

24  scopes for these projects were already developed when Reber took over, he provided some input

25  into the scopes and developed a schedule for the projects.  A large part of this position was

26  discussing the projects with contractors during on-site walks.  At the same time, he would

27  evaluate the contractors and relay this information to AIMCO at meetings every other week.

28

Eventually he recommended contractors to bid the projects and, after the bids were submitted, which contractors to hire.  AIMCO accepted his recommendation for the office building, but not the redevelopment.

After AIMCO hired the contractors, Reber supervised the contractors' performance to assure that they were on schedule and within budget.  He frequently developed "punch-lists" of tasks for the contractors to perform, and assured that they were completed.  He independently approved change orders on the projects.  When vendors submitted invoices, Reber would negotiate the invoices and determine whether they should be paid.  He also communicated with AIMCO regarding the progress of the projects.  When the contractor completed an apartment, Reber would approve it on behalf of AIMCO.

As an SDOC, Reber also trained DOCs on how to manage projects.

## II.    LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548 (1986).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e); *see also*

4

1  *Anderson,* 477 U.S. at 248-49.  Furthermore, a party cannot create a genuine issue of material

2  fact simply by making assertions in its legal papers.  There must be specific, admissible evidence

3  identifying the basis for the dispute.  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter*

4  *Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).  The Supreme Court has held that "[t]he

5  mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on

6  which the jury could reasonably find for [the opposing party]."  *Anderson*, 477 U.S. at 252.

7  **III.    DISCUSSION**

8          AIMCO's general contention is that both Dunnington and Reber are exempt from

9  overtime and meal and rest break requirements because they are administrative employees under

10  Industrial Welfare Commission ("IWC") Wage Order 5-2001 (the "Wage Order" or "Wage

11  Order 5-2001").

12          The California Labor Code provides authority for the IWC to make orders to assure

13  sufficient wages and working conditions in various industries.  *See* Cal. Labor Code § 1171, *et*

14  *seq.*.  The IWC has promulgated 17 Wage Orders: twelve industry-specific orders and five

15  occupation-based orders.  The Division of Labor Standards Enforcement ("DLSE") Policies and

16  Interpretation Manual details how to select the applicable Wage Order.  DLSE Policies and

17  Interpretation Manual 43.6.13 (2002).  It provides that, where both a industry-specific order and

18  an occupational order could apply to an employee, the industry-specific order governs.  *Id.*

19          Wage Order 5-2001 applies to "all persons employed in the public housekeeping industry

20  . . .."  Wage Order 5-2001 § 1.  It defines the "housekeeping industry" as "any industry,

21  business, or establishment which provides meals, housing, or maintenance services whether

22  operated as a primary business or when incidental to other operations in an establishment not

23  covered by an industry order of the Commission . . .."  *Id.* § 2(P).  The Wage Order lists as

24  examples "apartment houses" and "[e]stablishments contracting for development, maintenance

25  or cleaning of grounds, maintenance or cleaning of facilities and/or quarters of . . . living units .

26  ..."  *Id.*

27          Because AIMCO engages in the acquisition, construction, management and maintenance

28

of apartment housing, it is covered by Wage Order 5-2001.[1]  *See* DLSE Opinion Letter 1998-12-28 ("Wage Order 5. . . governs employers that own or manage apartment buildings." ); *Isner v. Falkenberg/Gilliam & Assocs., Inc.*, 160 Cal. App. 4th 1393, 1399 (2008) (applying Wage Order 5 to employees of home for the aged).

Wage Order 5-2001 regulates wages, hours, breaks, and reporting in the public housekeeping industry.  Wage Order 5-2001 §§ 3-5.  However, it provides exceptions for administrative, executive and professional employees.  *Id.* § 1(B).  A plaintiff is an administrative employee where he:  1) has duties involving "[t]he performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers;" 2) "customarily and regularly exercises discretion and independent judgment"; 3) "performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge;" 4) is "primarily engaged in duties which meet the test of the exemption; and 5) "earns  a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment."  *Id.* at § 1(b)(2). "Exempt work [includes] all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  *Id.*  The exception expressly references federal regulations under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, to be used in interpreting the wage order.  *Id.*  Further, authority used in interpreting similar provisions of the FLSA is persuasive in interpreting the Wage Order.  *See Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App,. 4th 1242, 1255-56 (relying on federal regulations interpreting analogous FLSA exception).

Because the administrative exception is an affirmative defense, AIMCO bears the burden of establishing each of the elements listed above.  *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th

---

[1] In light of this authority, Reber and Dunnington's contention that Wage Order 16-2001, which governs "occupations in the construction industry," is unpersuasive. Wage Order 16-2001 is an occupational order and is, therefore, trumped by 5-2001.  In either case, Reber and Dunnington have a far stronger argument under Wage Order 5-2001 than they do under 16-2001.

1   785, 794-795 (1999) (citations omitted).  Due to the remedial nature of the California Labor

2   Code provisions authorizing the IWC to promulgate Wage Orders, those orders are construed

3   liberally "for the protection and benefit of employees."  *Id.*  (quoting *Indus. Wage Comm'n v.*

4   *Superior Court*, 27 Cal. 3d 690, 702 (1980)).  "Thus, under California law, exemptions from

5   [wage and hour laws] are narrowly construed."  *Id.* (citations omitted).

6       "Whether employees are exempt . . . is primarily a question of fact."  *Nigg v. United*

7   *States Postal Service*, 50 F.3d 1071, 1079 (9th Cir. 2007) (citing *Hodgson v. The Klages Coal &*

8   *Ice Co.*, 435 F.2d 377, 382 (6th Cir. 1970)).  "The question of how [an employee] spent their

9   time working . . . is a question of fact.  The question whether their particular activities excluded

10  them from [benefits] is a question of law . . .."  *Icicle Seafoods, Inc.*, 475 U.S. 709, 714, 106 S.

11  Ct. 1527 (1986).

12      In opposition, Plaintiffs Reber and Dunnington argue that AIMCO has failed to establish

13  that they performed duties "directly related to management policies or general business

14  operations" of AIMCO and "customarily and regularly exercise[ ] discretion and independent

15  judgment" on "matters of significance."  *See* 29 C.F.R. § 541.202.   They do not dispute that

16  they performed specialized work under minimal supervision or that they were paid in excess of

17  two-times the minimum wage.

18          **A.      A Genuine Issue of Material Fact Exists as to Whether Dunnington and**

19                   **Reber were Primarily Engaged in the General Business of AIMCO**

20      Work related to management policies or general business is defined under 29 C.F.R. §

21  541.201, incorporated by reference into the Wage Order.  The regulation provides that:

22              To meet this requirement, an employee must perform work directly

23              related to assisting with the running or servicing of the business, as

24              distinguished, for example from working on a manufacturing

25              production line or selling a product in a retail or service

26              establishment.

27  29 C.F.R. 541.201(a).  It goes on to provide a list of examples, including: budgeting, auditing,

28

7

quality control, purchasing, procurement, safety and health, personnel management, human resources, labor relations, public relations, etc.. 29 C.F.R. § 541.201(b).  The United States Department of Labor has observed that the administrative exception, "may apply to the employee who supervises contractors, volunteers or other non-employees if the other requirements for that exemption are met." 69 Fed. Reg. 22135 (April 21, 2004).  The regulations go on to provide more detailed examples of administrative employees: insurance adjustors, financial services employees, employees leading a team assigned to complete major projects, executive or administrative assistants, human resources managers, or purchasing agents.  29 C.F.R. § 541.203(a-f).  They also provide examples of employees who do not qualify: ordinary inspection employees, "examiners or graders" such as those that grade materials, comparison shoppers, or public inspectors or investigators.  *Id.* § 541.203(g-j).

The examples listed in 29 C.F.R. § 541.203 evidence a distinction between simple, micro-level inspection or data-gathering and more complicated, macro-level planning, assessment and advising.   Duties such as grading or inspections based on application of standardized, objective criteria are not administrative.  *Id.* at § 541.203(j) ("Such employees also do not qualify for the administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met.")  Where an employee performs "specialized work along standardized lines involving well-established techniques and procedures," he or she is not exempt.  *Id.* at § 541.203(g).  In contrast, employees that engage in detailed analysis of facts and their import, or high-level planning and implementation are considered administrative.  *Id.* at § 541.203(a-c).

It seems clear that some of Reber and Dunnington's activities involved the management or business operations of AIMCO while others did not.  Because not all of the activities that AIMCO claims to be administrative are administrative, a genuine issue of material fact remains as to what portion of their time was spent on administrative activities.  Accordingly, summary judgment is inappropriate.

1    Conducting detailed property inspections to determine necessary repairs and replacements

2    seems akin to a building inspector or a "grader."  It involves using construction expertise to

3    apply standard criteria – i.e. whether the property needed repair.  For instance, Reber testified

4    that he would inspect "the stucco on the sides of building to . . . window leaks, asphalt,

5    landscaping [and] roofs."  This is a sort of fact-gathering function unrelated to setting

6    management policy or general business.  *Bratt v. County of Los Angeles*, 912 F. 2d 1066, 1069-

7    71 (9th Cir. 1990).  Soliciting bids from contractors might involve the general business of

8    AIMCO, particularly where it involved specific contacts known to Reber and Dunnington.

9    However, Reber and Dunnington also selected contractors based on a standard book used in the

10   industry known as the "blue book."  Further, although recommending a contractor could be

11   administrative, Reber testified that it was always based on one objective factor: who the lowest

12   bidder was.

13       In contrast, some of the work may have involved planning and analysis.  For instance,

14   providing detailed estimates is administrative.  *See Weis v. Advanced Construction Servs., Inc.*,

15   2:04CV52 , 2005 WL 2403628 at *3 (W.D. Pa. August 19, 2005) (cost estimation is business

16   related) (collecting cases); *Reyes v. Hollywood Woodwork, Inc.*, 360 F. Supp. 2d 1288, 1291-92

17   (S.D. Fla. 2005) (same).  Notably, however, Reber characterized his "estimates" as "rough

18   guesses."

19       After AIMCO created a budget, Reber and Dunnington walked through the sites with

20   business managers to create a "plan of attack" for completing repairs within budget.  This sort of

21   planning is part of the general business of AIMCO.  *See Kennedy v. Commonwealth Edison Co.*,

22   00-4053, 2003 WL 217895219 at *4 (C.D. Ill. June 23, 2003) (development of work plans for

23   repairs is related to the general business of power company); *Combs v. Skyriver*

24   *Communications, Inc.*, 150 Cal. App. 4th 1242 (2008) (maintenance, development of protocols,

25   and strategic planning for network is administrative);  *Bagwell v. Florida Broadband, LLC*, 385

26   F. Supp. 2d 1316 (S.D. Fla. 2005) (design and implementation of specifications for infrastructure

27   on network is administrative).

28

1   After the work scopes were developed, however, much of Dunnington and Reber's

2   activities were the sort of "day-to-day carrying out of [AIMCO]'s affairs" that is not related to

3   general business or management.  *See Bratt*, 912 F.2d at 1070.  For instance, assuring that

4   contractors met milestones in a timely manner seems to be an issue of scheduling versus the sort

5   of "quality control" identified in the Regulations.  *See Copas v. East Bay Municipal Utility Dist.*,

6   61 F. Supp. 2d 1017, (N.D. Cal. 1999) ("the responsibility of ensuring that outside contractors

7   performed their work correctly [does] not transform" a job into an administrative position.")

8   Likewise,  paying contractors and vendors, determining whether projects were complete, and

9   handling change orders, are all the sort of day-to-day operations not classified as administrative.

10   On the other hand, some of Dunnington and Reber's management activities were related to

11   general business – i.e. negotiating invoices.

12   This sort of mixed business/production activity continued in Dunnington's Hillcreste

13   assignment.  He developed a plan for dealing with complaints and acted as AIMCOs

14   representative on sight.  He also worked with contractors to set standards to minimize impact on

15   tenants.  These activities are analogous to the planning and development at issue in *Combs* and

16   *Bagwell*, *supra*..  However, he also inspected the premises and reported problems back to

17   AIMCO.  This is akin to the Probation Officers at issue in *Bratt*, *supra*., or the health and safety

18   inspectors listed in the Federal Regulations.

19   The same is true of Reber's work as an SDOC.  Taking contractors on walks at the

20   construction site and providing information about the projects does not seem to involve

21   management or general business.  Nor does assuring that the projects are completed on schedule

22   and within budget or reporting the same to AIMCO.   However, evaluating contractors and

23   making recommendations does.  Likewise, developing "punch-lists" is a planning activity

24   apparently related to general business.  Negotiating invoices is also business-related.

25   Because of the mixed nature of the duties performed by Dunnington and Reber, and

26   because the record is unclear with regard to the time they performed each sort of duty, a genuine

27   issue of material fact exists as to whether they were involved primarily – i.e. more than 50% of

28

1    the time – in such activities.

2    **B.**    **A Genuine Issue of Material Fact Exists as to Whether Dunnington and Reber**

3    **were Primarily Engaged in Activities that Involved the Regular and**

4    **Customary Exercise of Discretion and Independent Judgment on Matters of**

5    **Significance to AIMCO**

6    To qualify as an administrative employee, an employee must also "customarily and

7    regularly exercise[] discretion and independent judgment" on "matters of significance." Wage

8    Order 5-2001; 29 C.F.R. § 541.202(a). Use of "discretion and independent judgment" refers to

9    "the comparison and the evaluation of possible courses of conduct, and acting or making a

10    decision after the various possibilities have been considered." *Id.* "'[M] atters of significance'

11    refers to the level of importance or consequence of work performed." *Id.* This determination

12    must be made "in light of all the facts involved in the particular employment situation . . .." *Id.* §

13    541.202(b).

14    The Federal Regulations provide ten factors to consider in determining whether an

15    employee exercises discretion and independent judgment:

16    [1] whether the employee has authority to formulate, affect, interpret,

17    or implement management policies or operating practices; [2]

18    whether the employee carries out major assignments in conducting

19    the operations of the business; [3] whether the employee performs

20    work that affects business operations to a substantial degree, even if

21    the employee's sxzs assignments are related to operation of a

22    particular segment of the business; [4] whether the employee has

23    authority to commit the employer in matters that have significant

24    financial impact; [5] whether the employee has authority to waive or

25    deviate from established policies and procedures without prior

26    approval; [6] whether the employee has authority to negotiate and

27    bind the company on significant matters; [7] whether the employee

28

provides consultation or expert advice to management; [8] whether
the employee is involved in planning long- or short-term business
objectives; [9] whether the employee investigates and resolves
matters of significance on behalf of management; and [10] whether
the employee represents the company in handling complaints,
arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b).  "Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required."  69 Fed. Reg. 22143 (collecting cases).

For much the same reason as above, a genuine issue of material fact exists as to whether Reber and Dunnington primarily engaged in duties requiring the customary and regular exercise of discretion and independent judgment.

For instance, inspecting a property and determining what needs repair or replacement seems to involve merely "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202.  It is true that Reber and Dunnington have failed to identify the specific AIMCO policies applying to these inspections.  It is also true that employees can exercise discretion in highly regulated fields.  *See Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (6th Cir. 1982) (discretion exists in franchise context). However, these arguments miss the mark.  Applying their construction know-how to determine whether properties need repair is not an exercise of discretion, it is an exercise of skill.

It is also difficult for this Court to construe the PCAs as requiring discretion or independent judgment.  First, the DOCs "rough guesses" as to the cost of each project are distinct from the detailed estimates involved in *Reyes* and *Weis, supra. See Bell v. Farmers Ins. Exchange* (*Bell II*), 87 Cal. App. 4th 805 (2001) (claims representatives who settle low-cost claims for insurance company do not exercise discretion).  Moreover, although it is clear that final authority is unnecessary to establish discretion and independent judgment, *see* 29 C.F.R. §

541.202(c); *Heffelfinger*, 2008 U.S. Dist. LEXIS 46461, at *85-86, Reber's repeated testimony that AIMCO "never" followed the recommendations in his PCAs suggests that he did not exercise any independent judgment, even if prioritizing projects involved some level of discretion.

Developing work scopes clearly involved some independent judgment and discretion. *See Kennedy*, *supra*. The question is whether these work scopes were primarily related to matters of significance. Reber testified that they were projects involving costs of just over $1,000 to many thousands or millions. While some of these, for instance the $1,500,000 project that Dunnington worked on, were properly matters of significance, minor repairs, such as fixing a broken sidewalk, were not. These projects were certainly not on par with the high level planning identified in 29 C.F.R. § 541.202(c) as examples of discretionary duties.

Soliciting bids from contractors that are personal contacts involves discretion and independent judgment. Soliciting bids from contracts in the "blue book" does not. Likewise, selecting from among a number of bids could involve discretion and independent judgment. However, simply selecting the lowest bid involves no discretion or independent judgment.

The same mix of discretionary and non-discretionary tasks exists in Dunnington and Reber's oversight of projects. For instance, dealing with problems that arise on site could involve discretion, but merely assuring that work is properly and promptly completed does not. Nor does checking whether certain milestones have been completed or issuing checks to contractors.

On the Hillcreste project, Dunnington exercised discretion and independent judgment in addressing tenant complaints and setting rules and schedules for contractors. On the other hand, assuring timely performance and reporting back to AIMCO did not require discretion. Similarly, as SDOC, Reber engaged in some activities that involved discretion and others that did not. For instance, evaluating and recommending contractors involves discretion. Explaining projects to contractors does not.

Given that the Court cannot determine, as a matter of law, which of these were the

"primary" activities of Dunnington and Reber, summary judgment is inappropriate on Reber and Dunnington's Claims for Overtime, Meal and Rest Breaks, and Restitution under California Business and Professions Code § 12700.

**C.      Summary Judgment is Appropriate on Claim Two for Waiting Time Penalties**

California Labor Code § 203 provides that an employer is liable for penalties if it "willfully fails to pay" an employee amounts owed.  Reber and Dunnington claim that AIMCO willfully failed to pay for overtime, and meal and rest periods.   "However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203."  8 Cal. Code Reg. § 13520.  Although the Court has concluded that a genuine issue of material fact exists as to whether Reber and Dunnington are administrative employees, it is clear that a good faith dispute exists on this point.  Accordingly, penalties under Section 203 are unwarranted.

**D.      Summary Judgment is Appropriate on Claim Three for Failure to Furnish Wage and Hour Statements**

California Labor Code § 226 requires employers to provide itemized wage statements. This requirement does not apply if an employee falls under the administrative exception.  *Id.* at § 226(a).  Section 226(e) provides penalties for employees injured "as a result of a knowing and intentional failure by an employee" to provide such statements.  AIMCO contends, and Dunnington and Reber fail to dispute, that they were not injured by AIMCO's failure to provide such statements.  Further, because a good faith dispute exists as to whether Dunnington and Reber are exempt, AIMCO was not "knowing and intentional" in failing to provide such statements.

Accordingly, summary judgment is proper on Claim Three.

**IV.   DISPOSITION**

For the reasons identified above, the Court hereby GRANTS Summary Judgment as to Claims Two and Three and DENIES Summary Judgment on Dunnington and Reber's other claims.

IT IS SO ORDERED.

DATED: August 25, 2008

_David O. Carter_
_____
DAVID O. CARTER
United States District Judge